JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

**(b)** County of Residence of First Listed Plaintiff    Franklin
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Scott M. Pollins, 800 Westdale Avenue, Swarthmore, PA 19081-2311, 610-896-9909; Susan K. Pickford, 3400 Trindle Road, Camp Hill 17011, 717-695-3294

## DEFENDANTS

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
Thomas Collins, Buchanan, Ingersoll & Rooney, Harrisburg

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

❏ 1  U.S. Government
      Plaintiff

❏ 2  U.S. Government
      Defendant

☒ 3  Federal Question
      *(U.S. Government Not a Party)*

❏ 4  Diversity
      *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                   *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane | of Property 21 USC 881 | ❏ 423 Withdrawal | ❏ 400 State Reapportionment |
| ❏ 130 Miller Act | ❏ 315 Airplane Product | ❏ 690 Other | 28 USC 157 | ❏ 410 Antitrust |
| ❏ 140 Negotiable Instrument | Liability | | | ❏ 430 Banks and Banking |
| ❏ 150 Recovery of Overpayment | ❏ 320 Assault, Libel & | **PERSONAL INJURY** | **PROPERTY RIGHTS** | ❏ 450 Commerce |
| & Enforcement of Judgment | Slander | ❏ 365 Personal Injury - | ❏ 820 Copyrights | ❏ 460 Deportation |
| ❏ 151 Medicare Act | ❏ 330 Federal Employers' | Product Liability | ❏ 830 Patent | ❏ 470 Racketeer Influenced and |
| ❏ 152 Recovery of Defaulted | Liability | ❏ 367 Health Care/ | ❏ 840 Trademark | Corrupt Organizations |
| Student Loans | ❏ 340 Marine | Pharmaceutical | | ❏ 480 Consumer Credit |
| (Excludes Veterans) | ❏ 345 Marine Product | Personal Injury | **LABOR** | ❏ 490 Cable/Sat TV |
| ❏ 153 Recovery of Overpayment | Liability | Product Liability | ❏ 710 Fair Labor Standards | ❏ 850 Securities/Commodities/ |
| of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 368 Asbestos Personal | Act | Exchange |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle | Injury Product | ❏ 720 Labor/Management | ❏ 890 Other Statutory Actions |
| ❏ 190 Other Contract | Product Liability | Liability | Relations | ❏ 891 Agricultural Acts |
| ❏ 195 Contract Product Liability | ❏ 360 Other Personal | **PERSONAL PROPERTY** | ❏ 740 Railway Labor Act | ❏ 893 Environmental Matters |
| ❏ 196 Franchise | Injury | ❏ 370 Other Fraud | ❏ 751 Family and Medical | ❏ 895 Freedom of Information |
| | ❏ 362 Personal Injury - | ❏ 371 Truth in Lending | Leave Act | Act |
| | Medical Malpractice | ❏ 380 Other Personal | ❏ 790 Other Labor Litigation | ❏ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS** | Property Damage | ❏ 791 Employee Retirement | ❏ 899 Administrative Procedure |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights | ❏ 385 Property Damage | Income Security Act | Act/Review or Appeal of |
| ❏ 220 Foreclosure | ❏ 441 Voting | Product Liability | | Agency Decision |
| ❏ 230 Rent Lease & Ejectment | ☒ 442 Employment | **PRISONER PETITIONS** | **FEDERAL TAX SUITS** | ❏ 950 Constitutionality of |
| ❏ 240 Torts to Land | ❏ 443 Housing/ | **Habeas Corpus:** | ❏ 870 Taxes (U.S. Plaintiff | State Statutes |
| ❏ 245 Tort Product Liability | Accommodations | ❏ 463 Alien Detainee | or Defendant) | |
| ❏ 290 All Other Real Property | ❏ 445 Amer. w/Disabilities - | ❏ 510 Motions to Vacate | ❏ 871 IRS—Third Party | |
| | Employment | Sentence | 26 USC 7609 | |
| | ❏ 446 Amer. w/Disabilities - | ❏ 530 General | | |
| | Other | ❏ 535 Death Penalty | **IMMIGRATION** | |
| | ❏ 448 Education | **Other:** | ❏ 462 Naturalization Application | |
| | | ❏ 540 Mandamus & Other | ❏ 465 Other Immigration | |
| | | ❏ 550 Civil Rights | Actions | |
| | | ❏ 555 Prison Condition | | |
| | | ❏ 560 Civil Detainee - | | |
| | | Conditions of | | |
| | | Confinement | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
     Proceeding

❏ 2 Removed from
     State Court

❏ 3 Remanded from
     Appellate Court

❏ 4 Reinstated or
     Reopened

❏ 5 Transferred from
     Another District
     *(specify)*

❏ 6 Multidistrict
     Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. Section 1981
Brief description of cause:
Race discrimination and retaliation

## VII. REQUESTED IN COMPLAINT:

❏ CHECK IF THIS IS A CLASS ACTION
   UNDER RULE 23, F.R.Cv.P.

DEMAND $
Unliquidated

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ❏ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*      JUDGE                                DOCKET NUMBER

DATE    2/13/15

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #_____   AMOUNT_____   APPLYING IFP_____   JUDGE_____   MAG. JUDGE_____

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DONALD HOUSER ,** | : | |
| **YVETTE BRAXTON,** | : | |
| **WILLIAM HOUSER,** | : | **CIVIL ACTION NO.** |
| **SANTELL MILLER** | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | **JURY TRIAL DEMANDED** |
| | : | |
| **VISIONQUEST NATIONAL LTD** | : | |
| **Defendant** | : | |

## COMPLAINT

### I.     INTRODUCTION

1. Plaintiffs, Donald Houser (DHouser), Yvette Braxton (YBraxton), William Houser (WHouser), and Santell Miller (SMiller), bring this action under 42 U.S.C. § 1981.  Plaintiffs seeks back pay and back benefits, front pay and front benefits, compensatory and punitive damages, declaratory and injunctive relief, negative tax consequence damages, interest, costs, and attorney's fees from Defendant, VisionQuest National Ltd. (VisionQuest).

### II.     JURISDICTION AND VENUE

2. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

3. The unlawful acts and practices of VisionQuest were committed within or upon the direction of VisionQuest's agents, servants, employees and/or representatives within the Middle District of Pennsylvania.

### III.     PARTIES

4. Plaintiff, DHouser, is a black resident of Pennsylvania.

5. Plaintiff, YBraxton, is a black resident of Pennsylvania.

6. Plaintiff, WHouser, is a black resident of Pennsylvania.

7. Plaintiff, SMiller is a black resident of Pennsylvania.

8. Defendant, VisionQuest, is an Arizona corporation and is a national provider of juvenile rehabilitation services.  VisionQuest maintains a corporate office in Tucson, Arizona and facilities in Pennsylvania located at Rocky Mountain Road, South Mountain, Franklin County, PA and at Warfordsburg, Fulton County PA (referred to as 'Breezewood' facility). VisionQuest runs additional facilities in Pennsylvania and in eight other states.

9. VisionQuest employed DHouser from June 15, 2011 through April 24, 2013; YBraxton from May 24, 2011 through May 21, 2013; WHouser from April 1, 2012 through May 1, 2013; and SMiller from November 2012 through August 2014.

## IV.    FACTUAL BACKGROUND

### Plaintiff DHouser

10. DHouser applied for employment at VisionQuest on May 6, 2011. On his application, DHouser marked "Yes" to the yes-or-no question regarding criminal convictions.

11. After DHouser applied for employment, VisionQuest performed the required background checks and ChildLine clearances. VisionQuest received the results of these checks and clearances on May 25, 2011.

12. Because DHouser had a criminal background, VisionQuest required him to write a letter of explanation. DHouser provided the letter as required.

13. After DHouser provided VisionQuest with a letter of explanation, VisionQuest hired him. He began working as a Direct Care Staff on June 15, 2011 at the South Mountain facility at an annual salary of $25,000/year.

14. On about October 25, 2011, VisionQuest gave DHouser a satisfactory evaluation.

15. On about November 1, 2011, VisionQuest promoted DHouser to Shift Supervisor and increased his salary to $32,000/year.

16. On about November 30, 2011 VisionQuest recognized DHouser as a Staff of the Month.

17. On about March 25, 2012, VisionQuest gave DHouser an evaluation signed by Barry Williams (Williams), Human Relations and Safe Crisis Management (SCM) trainer, black, stating that

–"Don has the ability to build great relationships with youth and encourage them to bring out there best. He has worked with the more difficult youth and has been able to stabilize their behaviors and get them invested into the program…Don has worked really hard to implement the fabric into the everyday milieu in relations to room assignments and how the unit functions. With his initiative the camp and youth has embraced this process and youth are doing very well with accepting accountability and holding each other accountable. Don has also been extremely instrumental in working with new staff in the professional development….As a member of the leadership team, Don continues to challenge and push members of the leadership team to remain consistent and raise the standard by which we perform and are viewed."

18. On about March 30, 2012, VisionQuest again recognized DHouser as a Staff of the Month.

19. On May 1, 2012, VisionQuest promoted DHouser to Program Director and increased his salary to $40,000/year.

20. On May 15, 2012, VisionQuest recognized DHouser as a Staff of the Month for the third time in six months.

21. In August 2012, Robert Ledger Burton, VisionQuest's Founder and Chairman of the Board, presented a ceremonial pipe to DHouser for outstanding leadership at the 4th National Congress with over 300 staff and executives present. This award has only been bestowed upon 64 employees since the inception of VisionQuest.

22. During DHouser's employment at South Mountain, the day shift included approximately 60 staff members. All of those staff were white except Williams.  The second and third shift child care workers constituted approximately 16 to 20 staff members and were almost exclusively black.  The juvenile population of South Mountain was approximately 59 black children and 5 white children.

23. During the time DHouser worked at South Mountain, white day shift supervisory staff encouraged and participated in making degrading racial comments, filming racially degrading videos while consuming alcohol at parties on VisionQuest property and creating a severe and pervasive environment of racial discrimination and racial tension. This conduct and behavior included the following.

- In late 2012, Dan Barenbaum, Direct Care Worker, white, made a video show for YouTube on VisionQuest property which consisted of numerous videos of racial skits and jokes offensive and demeaning to blacks.  These skits included the use of the term "colored people", people brushing their teeth with a broom and exaggerated buck teeth. Skits demeaning persons of Asian background were also produced showing the 'actors' pulling their eyes back and speaking in exaggerated speech.  Jokes including; "whoever would take a cheeseburger from a black man might as well take his parking tickets and

colt 45" and "The only way a black man can get a Master's Degree is if one of his parents is white."

-VisionQuest staff members involved in the making of these videos included Brett Lasley, Supervisor, white, Richard Robinson, Supervisor, white, and Todd Johnson, Case Manager, black. Of several female voices heard in the background of the video, upon information and belief, one of the female voices is Kris Smihal (Smihal), Chief Administrative Officer, white.

- The above described videos were uploaded to YouTube and a link was sent to black employees including WHouser.

- The videos were made at the farmhouse on VisionQuest property where a number of the white staff lived rent free.  Juveniles in residence at South Mountain (all black) were camped outside the farmhouse when the videos were made.

- Smihal suspended Messrs. Barenbaum, Robinson, Lasley and Johnson for one week for their involvement in making and disseminating the video.

- The day after his return to work following the suspension, Mr. Robinson walked through the juveniles' residences with his pants pulled down low, one pant leg pulled up, wearing a "do-rag" on his head and speaking in 'ghetto' talk, in an attempt to mock, ridicule and denigrate blacks;

- Tammy Hann, nurse, white, called black staff members including WHouser "nigger" on several occasions.

24. In accordance with the corporate chain of command, DHouser reported the video to YBraxton who then reported it to Smihal, who upon information and belief was already aware of the video because she was present for at least part of the video.

25. Instead of reporting the incident to VisionQuest's corporate office, Smihal approached DHouser and warned him that - "if this gets in the wrong people's ears there will be trouble".

26. Upon information and belief, Jim Yester (Yester), Vice President of Human Relations, white, became aware of the video through an anonymous phone call. Upon information and belief, Yester told Smihal not to fire the people involved in making the video because - 'it could come back on them as discrimination."

27. On about January 23, 2013, Gerald Fox (Fox), Regional Director, white, approached DHouser and asked him to take on the position of Chief Administrator of the Breezewood facility at a salary of $53,000/year. DHouser accepted the promotion

28. On about January 23, 2013, VisionQuest gave DHouser an evaluation signed by Smihal and stating in part:

> -"[Emotional Management] is an area in which Don has excelled in the program. Don has a strong handle on managing his own emotions and through role modeling and setting expectations he has endeavored to create an environment in which emotions can be expressed in a safe manner. Don is a member of the Sanctuary leadership team, and is a strong advocate for the use of safety plans and other cognitive techniques as a tool to teach both youth and staff how to manage their emotions…….Don has been clear about his career path within the company from when he first started. His leadership qualities were evidenced immediately leading to his promotions from Shift Supervisor to Program Director and now to Chief Administrator. Don is functioning very well in his current position and his loss to the VQASM team will be felt for a long time. Don is excited to take on this new opportunity and will take both lessons he learned from VQASM and new ideas into his new position, to make the Breezewood program the best it can be.

29. When DHouser became Chief Administrator at Breezewood, there were approximately 30 white employees and one black employee other than DHouser.

30. The racial makeup of the Breezewood juvenile population was approximately 29 black girls and 4 white girls. Fox and Jeff Giovino (Giovino), Regional Director, white, discussed the racial makeup of Breezewood staff and juveniles and encouraged DHouser to integrate the staff at Breezewood by hiring more black employees.  Referrals to Breezewood had been declining due to kids complaining that there were no black staff they could relate to.  Yester, Fox and Giovino tasked DHouser with bringing in qualified black employees to the Breezewood facility. Shortly after DHouser took the position, the number of juveniles referred to the camp doubled.

31. After becoming Chief Administrator at Breezewood, DHouser complied with VisionQuest's directive to racially integrate the staff. He hired and transferred black employees to Breezewood including YBraxton.   WHouser had requested and was awaiting transfer to Breezewood from South Mountain when VisionQuest terminated DHouser.

32. Shortly after DHouser's arrival at Breezewood, inappropriate racial comments were made regarding the number of black employees coming to Breezewood. Amy Johnson, nurse, white, said "soon the only whites we will see is the whites of our eyes. The whole camp will be black".  Cierra Johnson, Supervisor, white, called YBraxton a 'nigger' and also stated that "there is a difference between a black man and a 'nigger', DHouser is not a black man, he is a 'nigger'."  Another white employee said, "we need to knock one of those little black things down."

33. As DHouser brought black employees to Breezewood, Tina Verba (Verba), Human Relations representative for Breezewood, white, stated that 'things were going to change."

34. In approximately the end of February/beginning of March 2013, DHouser was on a conference call with Yester and Fox. During this conference call, DHouser discussed the serious issues with race relations between the mostly white staff and mostly black juvenile population that he had experienced since becoming the Chief Administrator at Breezewood. DHouser told Yester and Fox that VisionQuest needed to address cultural diversity at Breezewood. Yester and Fox acknowledged DHouser's concerns and it was agreed that DHouser would conduct diversity training at Breezewood.

35. Also in approximately February/March, DHouser spoke with Fox and Fox's manager, Giovino, about the race issues at Breezewood.

36. Upon information and belief, Verba provided the social security numbers for DHouser and WHouser to Sarah Taylor, prior Chief Administrator at Breezewood, white, and Tammy Hann, nurse at South Mountain, white.  Upon information and belief, both women searched the criminal backgrounds of DHouser and WHouser on line.

37. On about April 12, 2013 DHouser learned that an anonymous email was sent to VisionQuest's corporate office about his criminal history. Yester, Fox, and Giovino told DHouser he should not be concerned.

38. On about April 17, 2013, a circle meeting was held with all staff to discuss the anonymous email about DHouser's criminal history.  Fox acknowledged VisionQuest's knowledge of DHouser's criminal history when they hired him.  Fox said he did not see it as a problem and further said: "We know everything there is to know. We are OK."

39. On about April 22, 2013, DHouser met with Giovino, and Fox to discuss the anonymous email and his criminal history.

40. Throughout his approximately four month tenure at Breezewood, DHouser had repeatedly informed Fox about the racial issues between the mostly white staff and mostly black juvenile population.

41. On about April 24, 2013, Yester terminated DHouser. Yester told DHouser he was terminated for being dishonest about his criminal history. DHouser requested written confirmation of the reason for his termination and Yester refused.

42. VisionQuest terminated DHouser because of his race and/or in retaliation for complaining of racist comments and behavior at the Breezewood and South Mountain facilities.

43. Upon information and belief, VisionQuest's discriminatory and retaliatory treatment of DHouser is pursuant to a practice and policy of VisionQuest to discriminate against minority employees and retaliate against employees who complain about race discrimination.

44. VisionQuest engaged in intentional discrimination and retaliation against DHouser with malice or reckless indifference to his rights under Section 1981.

**Plaintiff YBraxton**

45. VisionQuest hired Plaintiff YBraxton on May 24, 2011 as a full time Clinical Director of Treatment at South Mountain at a salary of $35,000/year.

46. In October 2011, VisionQuest promoted YBraxton to Director of Compliance and Treatment and gave her a pay raise to $45,000/year.

47. During the time YBraxton worked at South Mountain, day shift supervisory staff encouraged and participated in making degrading racial comments, filming racially degrading videos while consuming alcohol at parties on VisionQuest property and

creating a severe and pervasive environment of racial discrimination and racial tension. More specific incidents and events are described in Paragraph 23.

48. In accordance with the corporate chain of command, YBraxton reported the video to Smihal, who upon information and belief was already aware of the video because she was present for at least part of the making of the video.

49. Instead of reporting the incident to VisionQuest's corporate office, Smihal approached DHouser and warned him that if this gets in the wrong people's ears there will be trouble.

50. Upon information and belief, Yester became aware of the video through an anonymous phone call. Upon information and belief, Yester told Smihal not to fire the people involved in making the video because it could come back on them as discrimination.

51. YBraxton also reported these incidents to Giovino and Phyllis Yester, Vice President Admissions, white, when they held a meeting at South Mountain investigating other allegations regarding Smihal.

52. In February 2013, YBraxton requested a transfer to the Breezewood facility to work on a team with DHouser. Smihal told YBraxton that she could not transfer until she (YBraxton) hired her replacement. From February to April 1, Smihal questioned YBraxton regularly about whether or not she was sure she wanted to go to Breezewood.

53. On April 1, YBraxton transferred to Breezewood. Her job at Breezewood was Clinical Director of Treatment.

54. At the time YBraxton transferred to Breezewood, there were less than six black staff at the Breezewood camp which employed approximately 35 to 40 staff.

55. Approximately a week after her arrival at Breezewood, YBraxton observed white staff failing to follow rules regarding the youth including allowing them to enter buildings without staff and not requiring them to walk in a line when traveling on the grounds. YBraxton, having been Director of Compliance at South Mountain, redirected the youth and, in private, spoke to staff about the compliance issues.

56.  Shortly after YBraxton began to correct non-compliant behavior, Christine Hare reported to DHouser that she heard Cierra Johnson comment to other white staff,"that black bitch is going to get us in trouble".  Cierra Johnson was speaking about YBraxton.  This comment was made to Tina Verba, Amy Johnson and Kelly Madden.

57. DHouser informed YBraxton of this comment and it was discussed with Fox as part of the discussion regarding racial tension.

58. In the month of April, YBraxton spoke to Fox on several occasions regarding the racial tension between black and white staff and between white staff and black juveniles at Breezewood.

59. Between April 1 and April 24, 2013, YBraxton participated in multiple circle meetings which included all staff on that particular shift. The circle meeting is the method of disseminating and sharing information and discussing concerns utilized by VisionQuest. The racial tension and conflict at Breezewood was discussed in several such circle meetings.

60. At a circle meeting in April, it was revealed by Fox that white staff felt disrespected because juveniles were confiding in and respectful to YBraxton and DHouser and not the white staff.  Fox reported a concern of the white staff that the black staff would be coming in and taking over the camp.

61. In several circle meetings in April, DHouser and Fox discussed plans to begin cultural diversity training for staff and juveniles.

62. In approximately mid-April, DHouser was in a finance meeting with Fox, Verba and Peter J. Ranalli, VisionQuest's CEO, Yester and Eric (last name unknown). Mr. Rinalli, Yester and Eric participated in this meeting by telephone. During the meeting, Mr. Ranalli suggested Breezewood eliminate the clinical director position (YBraxton's job). Fox said that he did not want to get rid of YBraxton or give her a lower paying job. Instead, Fox suggested that they eliminate Mr. Madden's position (compliance director) and YBraxton take over his duties.

63. On April 24, 2013 DHouser was suddenly fired. The staff was given no explanation.

64. After DHouser was terminated there was no further discussion about cultural diversity training.

65. On April 25, the day after VisionQuest terminated DHouser, Fox asked YBraxton to work weekends and extra shifts while similarly situated white managers (Verba, Kelly Madden, and Amy Johnson) were not asked to do so.

66. On Friday April 26, Giovino directed YBraxton to work the weekend even though she was not scheduled to work weekends. When she said that she was unable to work on such short notice, Giovino told her he would meet with her on Monday.

67. On Sunday April 28, YBraxton reported for work even with the short notice Giovino had given her. Shortly after she arrived at work, Giovino called her into a meeting during which he reprimanded her for failing to obtain his permission to leave the facility after her shift the prior week.  Upon information and belief, none of the white

managers were required to obtain Giovino's permission to leave the facility after their

shift ended.  Giovino questioned YBraxton's commitment to her job even though

YBraxton had come into work on a Sunday to finish work a white caseworker had failed

to complete the week before. Upon information and belief, Giovoni knew that the white

caseworker had taken time off without permission and had only worked four days the

previous week.

68. On Monday April 29, Giovino told YBraxton that she was now required to be

at work on May 2 for a county agency camp visit despite knowing that YBraxton had

previously scheduled leave for that day. Giovino told YBraxton that all managers were

required to attend the meeting.

69. On May 2, Verba, was not present at the facility. Mr. Madden and Amy

Johnson were present at the facility but did not attend the meeting even though Giovino

had told YBraxton all managers were required to attend.  Before YBraxton left the camp,

Fox asked her what day she would be working the upcoming weekend.

70. On about May 16, YBraxton became sick at work and was taken to the

hospital and told to see her doctor before returning to work.

71. On May 21, less than a month after VisionQuest terminated DHouser,

VisionQuest laid off YBraxton. Giovino stated the reason for her termination was lack of

funds for her position which she had filled less than two months earlier.

72. Notwithstanding Giovino's explanation for terminating YBraxton, upon

information and belief, VisionQuest placed Mr.  Madden, who is white, into YBraxton's

position.

73. In October, five months after YBraxton was laid off, VisionQuest advertised seven positions for hire. VisionQuest did not offer YBraxton any of these positions.

74. VisionQuest terminated YBraxton because of her race, her association with DHouser and in retaliation for complaining of racist comments and behavior at the Breezewood and South Mountain facilities.

75. Upon information and belief, VisioinQuest's discriminatory and retaliatory treatment of YBraxton is pursuant to a practice and policy of VisionQuest to discriminate against minority employees and retaliate against employees who complain about race discrimination.

76. VisionQuest engaged in intentional discrimination and retaliation against YBraxton with malice or reckless indifference to her rights under Section 1981.

**Plaintiff WHouser**

77. On about March 24, 2012, WHouser applied for a position with VisionQuest at the South Mountain facility and marked "Yes" to the yes-or-no question regarding criminal convictions.

78. Prior to hiring WHouser, VisionQuest performed the required background checks and ChildLine clearances and received the results.

79. Because he had a criminal record, VisionQuest required WHouser to write a letter of explanation. WHouser provided the letter as required.

80. WHouser began working for VisionQuest as a second shift Direct Care Staff on April 1, 2012 at the South Mountain facility at an annual salary of $22,500.

81. In June 2012, VisionQuest promoted WHouser to Shift Supervisor. As part of the promotion process, VisionQuest required WHouser to sign a paper saying his

personnel file was audited, the proper background checks were completed and he had the proper education for the position.

82. In February 2013, VisionQuest named WHouser Employee of the Month and commended him for his success in reducing the need for restraints with juveniles to a record low.

83. In April 2013, Smihal approached WHouser and solicited him for a position as Program Director at South Mountain. However, this position was eventually given to a white employee.

84. At the time WHouser was employed at South Mountain on the second shift, the day shift staff totaled approximately 60 staff members, all of whom were white with the exception of Williams.  The second and third shift child care workers constituted approximately 16 to 20 staff members and were almost exclusively black.  The juvenile population of South Mountain was approximately 59 black children and 5 white children.

85. During the time WHouser was employed at South Mountain, day shift supervisory staff encouraged and participated in making degrading racial comments, filming racially degrading videos while consuming alcohol at parties on VisionQuest property and creating a severe and pervasive environment of racial discrimination and racial tension. More specific incidents and events are described in Paragraph 23.

86. In late 2012, the day after the video was made, WHouser received a text from Richard Robinson stating that Dan Barenbaum had a YouTube channel show and is running a video. He included a link to the video described above.  After viewing the video, WHouser reported to DHouser, his supervisor, that a racist video had been produced by VisionQuest staff and uploaded to YouTube.

87. WHouser reported some of the incidents described in Paragraph 26 to Smihal, Williams and DHouser. Two meetings were held at South Mountain concerning racism at the camp. In attendance were Smihal, DHouser, YBraxton and Williams.

88. In April 2013, WHouser requested a transfer to Breezewood to work with DHouser.  Smihal advised WHouser that the corporate office in Arizona required all files to be audited and his would be the first.

89. Smihal and Williams advised WHouser that his criminal background check previously in his file was now missing and that he would have to leave the facility until it was replaced.  WHouser obtained a copy of his criminal background check and provided it to Smihal.

90. On May 1, one week after VisionQuest terminated DHouser, Smihal terminated WHouser. The reason given was 'dishonesty regarding his criminal history'.

91. The email sent to VisionQuest's corporate office in Arizona regarding DHouser's criminal history also included WHouser's criminal history.

92. VisionQuest terminated WHouser because of his race, his association with DHouser and/or in retaliation for raising the issues of racist comments and behavior at the South Mountain facility.

93. Upon information and belief, VisionQuest's discriminatory and retaliatory treatment of WHouser is pursuant to a practice and policy of VisionQuest to discriminate against minority employees and retaliate against employees who complain about race discrimination.

94. VisionQuest engaged in intentional discrimination and retaliation against WHouser with malice or reckless indifference to his rights under Section 1981.

**Plaintiff SMiller**

95. VisionQuest hired SMiller in November 2012 as a Direct Care Worker at South Mountain facility earning $21,840/year.

96. During the time SMiller was employed at South Mountain, day shift supervisory staff encouraged and participated in making degrading racial comments, filming racially degrading videos while consuming alcohol at parties on VisionQuest property and creating a severe and pervasive environment of racial discrimination and racial tension. More specific incidents and events are described in Paragraph 23.

97. SMiller heard the audio portion of the video and heard white staff calling black staff members "monkey".

98. SMiller complained about the video described in Paragraph 23 to Smihal and Williams.

99. In February 2014, SMiller was promoted to Shift Supervisor.

100. One week after VisionQuest fired DHouser, SMiller was called into a meeting with Williams and Smihal and told that his criminal background check was missing from his file. SMiller subsequently provided a copy of his background check.

101. In June 2014, SMiller was asked to assist Tammy Hann (Hann), nurse, white, with a youth who was refusing to take his medications. The youth was epileptic and had had seizures at VisionQuest.

102. After attempting to calm the youth, Hann threatened to remove him from VisionQuest if he did not take his medications. The youth did not comply and remained out of control. Hann left to make a call regarding the youth.

103. McGee, Direct Care Worker, black, assisted SMiller with the youth. The youth accused McGee of slamming him with a door. The youth then became more agitated and experienced a seizure.

104. SMiller lowered the youth to the ground and told McGee to report the seizure to Hann. The youth regained consciousness and accused SMiller of choking him. SMiller took the youth to Hann to be examined. The youth also accused Hann of choking him.

105. Upon information and belief, Will Schoenfelder, case manager, white, reported the allegations against SMiller and McGee but did not report the allegations against Hann despite being required to do so.

106. In July, SMiller and Angel Gonzales (Gonzales) were made aware of a white staff member, Suzanne (last name unknown) taking drugs and cigarettes from youths, throwing them in to the woods and failing to report the contraband which violates VisionQuest mandatory reporting rules. SMiller and Gonzales give Suzanne until 8 pm that day to report herself or they will have to.  Suzanne did not self-report. SMiller and Gonzales reported the activity to Williams. Upon information and belief, during the investigation of this report, it was found that a white male staff was bringing cigarettes and pills into the camp for youths.  This person was fired and rehired. Suzanne was not reprimanded. She was promoted.

107. In early August, SMiller was injured during a restraint of a youth and suffered damage to his ACL and NCL. He applied for worker's compensation benefits.

108. On August 14, SMiller was called in by Yester, Williams and Smihal regarding the allegations of the youth who suffered the seizure.  VisionQuest told SMiller

that it would stand behind him but he needed to write a statement of what happened, which he did.

109. The next day, VisionQuest fired SMiller alleging that he lied in his statement about the incident.

110. SMiller applied for and was granted worker's compensation and unemployment compensation benefits.

111. In November 2014, SMiller was investigated by state police regarding the incident with the youth. SMiller passed a polygraph and no charges were filed.

112. Upon information and belief, other black staff who were receiving worker's compensation benefits were fired immediately after applying for and receiving benefits.

1163. SMiller was terminated because of his race and in retaliation for raising the issues of racist comments and behavior at the South Mountain facility and/or in retaliation for applying for and receiving worker's compensation benefits.

114. Upon information and belief, VisionQuest's discriminatory and retaliatory treatment of SMiller is pursuant to a practice and policy of VisionQuest to discriminate against minority employees and retaliate against employees who complain about race discrimination or file for worker's compensation benefits.

115. VisionQuest engaged in intentional discrimination and retaliation against SMiller with malice or reckless indifference to his rights under Section 1981.

V.      **CLAIMS**
**COUNT I - DHOUSER  v. VISIONQUEST**
**RACE DISCRIMINATION – 42 U.S.C. § 1981**

116. Paragraphs 1 through 115 are incorporated by reference as if fully set forth herein.

117. The acts, failures to act and conduct of VisionQuest set forth above constitute intentional discrimination on the basis of DHouser's race in violation of 42 U.S.C. § 1981.

WHEREFORE, Plaintiff, Donald Houser, respectfully demands judgment in his favor and against Defendant, VisionQuest National Ltd., for back pay and back benefits, front pay and front benefits, compensatory damages, punitive damages, attorney's fees plus costs, interest, negative tax consequence damages, declaratory relief that the conduct engaged in by VisionQuest violated DHouser's civil rights, equitable/injunctive relief directing VisionQuest to cease any and all retaliatory conduct against their employees and such other relief as the Court shall deem appropriate.

### COUNT II - DHOUSER v. VISIONQUEST
### RETALIATION – 42 U.S.C. § 1981

118. Paragraphs 1 through 115 are incorporated by reference as if fully set forth herein.

119. The acts, failures to act and conduct of VisionQuest set forth above constitute retaliation against DHouser in violation of 42 U.S.C. § 1981.

WHEREFORE, Plaintiff, Donald Houser, respectfully demands judgment in his favor and against Defendant, VisionQuest National, Ltd., for back pay and back benefits, front pay and front benefits, compensatory damages, punitive damages, attorney's fees plus costs, interest, negative tax consequence damages, declaratory relief that the conduct engaged in by VisionQuest violated DHouser's civil rights, equitable/injunctive relief directing VisionQuest to cease any and all retaliatory conduct against their employees and such other relief as the Court shall deem appropriate.

## COUNT III - YBRAXTON v. VISIONQUEST
### RACE DISCRIMINATION – 42 U.S.C. § 1981

120. Paragraphs 1 through 115 are incorporated by reference as if fully set forth herein.

121. The acts, failures to act and conduct of VisionQuest set forth above constitute intentional discrimination on the basis of YBraxton's race in violation of 42 U.S.C. § 1981.

WHEREFORE, Plaintiff, Yvette Braxton, respectfully demands judgment in her favor and against Defendant, VisionQuest National, Ltd., for back pay and back benefits, front pay and front benefits, compensatory damages, punitive damages, attorney's fees plus costs, interest, negative tax consequence damages, declaratory relief that the conduct engaged in by VisionQuest violated YBraxton's civil rights, equitable/injunctive relief directing VisionQuest to cease any and all retaliatory conduct against their employees and such other relief as the Court shall deem appropriate.

## COUNT IV - YBRAXTON v. VISIONQUEST
### RETALIATION – 42 U.S.C. § 1981

122. Paragraphs 1 through 115 are incorporated by reference as if fully set forth herein.

123. The acts, failures to act and conduct of VisionQuest set forth above constitute retaliation against YBraxton in violation of 42 U.S.C. § 1981.

WHEREFORE, Plaintiff, Yvette Braxton, respectfully demands judgment in her favor and against Defendant, VisionQuest National, Ltd., for back pay and back benefits, front pay and front benefits, compensatory damages, punitive damages, attorney's fees plus costs, interest, negative tax consequence damages, declaratory relief that the conduct

engaged in by VisionQuest violated YBraxton's civil rights, equitable/injunctive relief

directing VisionQuest to cease any and all retaliatory conduct against their employees

and such other relief as the Court shall deem appropriate.

## COUNT V - WHOUSER v. VISIONQUEST
## RACE DISCRIMINATION – 42 U.S.C. § 1981

124. Paragraphs 1 through 115 are incorporated by reference as if fully set forth

herein.

125. The acts, failures to act and conduct of VisionQuest set forth above

constitute intentional discrimination on the basis of WHouser's race in violation of 42

U.S.C. § 1981.

WHEREFORE, Plaintiff, William Houser, respectfully demands judgment in his

favor and against Defendant, VisionQuest National, Ltd., for back pay and back benefits,

front pay and front benefits, compensatory damages, punitive damages, attorney's fees

plus costs, interest, negative tax consequence damages, declaratory relief that the conduct

engaged in by VisionQuest violated WHouser's civil rights, equitable/injunctive relief

directing VisionQuest to cease any and all retaliatory conduct against their employees

and such other relief as the Court shall deem appropriate.

## COUNT VI - WHOUSER v. VISIONQUEST
## RETALIATION – 42 U.S.C. § 1981

126. Paragraphs 1 through 115 are incorporated by reference as if fully set forth

herein.

127. The acts, failures to act and conduct of VisionQuest set forth above

constitute retaliation against WHouser in violation of 42 U.S.C. § 1981.

WHEREFORE, Plaintiff, William Houser, respectfully demands judgment in his favor and against Defendant, VisionQuest National, Ltd., for back pay and back benefits, front pay and front benefits, compensatory damages, punitive damages, attorney's fees plus costs, interest, negative tax consequence damages, declaratory relief that the conduct engaged in by VisionQuest violated WHouser's civil rights, equitable/injunctive relief directing VisionQuest to cease any and all retaliatory conduct against their employees and such other relief as the Court shall deem appropriate.

## COUNT VII - SMILLER v. VISIONQUEST
## RACE DISCRIMINATION – 42 U.S.C. § 1981

128. Paragraphs 1 through 115 are incorporated by reference as if fully set forth herein.

129. The acts, failures to act and conduct of VisionQuest set forth above constitute intentional discrimination on the basis of SMiller's race in violation of 42 U.S.C. § 1981.

WHEREFORE, Plaintiff, Santell Miller, respectfully demands judgment in his favor and against Defendant, VisionQuest National, Ltd., for back pay and back benefits, front pay and front benefits, compensatory damages, punitive damages, attorney's fees plus costs, interest, negative tax consequence damages, declaratory relief that the conduct engaged in by VisionQuest violated SMiller's civil rights, equitable/injunctive relief directing VisionQuest to cease any and all retaliatory conduct against their employees and such other relief as the Court shall deem appropriate.

## COUNT VIII - SMILLER v. VISIONQUEST
## RETALIATION – 42 U.S.C. § 1981

130. Paragraphs 1 through 115 are incorporated by reference as if fully set forth herein.

131. The acts, failures to act and conduct of VisionQuest set forth above constitute retaliation against SMiller in violation of 42 U.S.C. § 1981.

WHEREFORE, Plaintiff, Santell Miller, respectfully demands judgment in his favor and against Defendant, VisionQuest National, Ltd., for back pay and back benefits, front pay and front benefits, compensatory damages, punitive damages, attorney's fees plus costs, interest, negative tax consequence damages, declaratory relief that the conduct engaged in by VisionQuest violated SMiller's civil rights, equitable/injunctive relief directing VisionQuest to cease any and all retaliatory conduct against their employees and such other relief as the Court shall deem appropriate.

## COUNT IX - SMILLER v. VISIONQUEST
## RETALIATORY DISCHARGE IN VIOLATION OF PUBLIC POLICY

132. Paragraphs 1 through 115 are incorporated by reference as if fully set forth herein.

133. At all times material hereto, VisionQuest was SMiller's employer.

134. During his tenure of employment with VisionQuest, SMiller satisfactorily performed his job.

135. VisionQuest terminated SMiller in retaliation for bringing a workers compensation claim, which is in violation of Pennsylvania's public policy.

WHEREFORE, Plaintiff, Santell Miller, demands judgment in his favor and against Defendant, VisionQuest National Ltd., for compensatory and punitive damages plus interest, costs, delay damages and such other relief as the Court may deem appropriate.

Respectfully submitted,                              Respectfully submitted,

By:    /s/ Susan K. Pickford                By:    /s/ Scott M. Pollins
       Susan K. Pickford                            Scott M. Pollins
       Pa. Atty. Id. No. 43093                      Pa. Atty. Id. No. 76334
       3400 Trindle Road                            800 Westdale Avenue
       Camp Hill, PA 17011                          Swarthmore, PA 19081-2311
       (717)695-3294 (p)                            (610) 896-9909 (phone)
       (717)695-3592 (f)                            (610) 896-9910 (fax)
       (717)777-1210 (c)                            scott@pollinslaw.com (email)
       attorneypickford@gmail.com

                         Attorneys for Plaintiffs
Date:    2/13/15