**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DONALD HOUSER,** | : | |
| **YVETTE BRAXTON,** | : | |
| **WILLIAM HOUSER,** | : | |
| **SANTELL MILLER,** | : | |
| **Plaintiffs** | : | **No. 1:15-cv-00327** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **VISIONQUEST NATIONAL LTD.,** | : | |
| **Defendant** | : | |

**<u>MEMORANDUM</u>**

Plaintiffs Donald Houser ("DHouser"), William Houser ("WHouser"), Yvette Braxton ("Braxton"), and Santell Miller ("Miller") filed a complaint against Defendant VisionQuest National Ltd. ("VisonQuest"), on February 17, 2015, alleging that they were fired by VisionQuest due to their race and that Defendant retaliated against them, all in violation of 42 U.S.C. § 1981. (Doc. No. 1.) Miller subsequently settled with Defendant.

Defendant filed motions for summary judgment with respect to the three remaining plaintiffs on July 14, 2017. (Doc. Nos. 38, 41, 44.) The motions have been fully briefed. Pursuant to Plaintiffs' request, the Court held oral argument on the motions on Friday, October 20, 2017. For the reasons that follow, the Court will deny Defendant's motions for summary judgment.

## I. BACKGROUND[1]

### A. Plaintiffs Donald and William Houser

---

[1] The following relevant facts of record, taken from Defendant's statements of undisputed material facts (Doc. Nos. 39, 42, 45), are undisputed unless otherwise noted. Defendant's statements of material facts contain specific citations to the record in numbered paragraphs. The Court also incorporates facts set forth in Plaintiffs' responses to Defendant's statements of material facts (Doc. Nos. 50-52), as well as other documents of record, where appropriate.

Defendant VisionQuest provides juvenile rehabilitation services and operated several facilities in Pennsylvania. (Doc. Nos. 39 ¶ 110, 42 ¶ 81, 51 ¶ 110, 52 ¶ 81.) DHouser, who is African-American, was hired by Defendant in May 2011 as a childcare worker at Defendant's South Mountain location. (Doc. Nos. 39 ¶ 15, 51 ¶ 15.) Over the next two years, DHouser was promoted three times and received $25,000 in raises. (Doc. Nos. 39 ¶¶ 18-27, 51 ¶¶ 18-27.) During his period of employment, other African-Americans worked for Defendant at South Mountain, and Defendant was interested in hiring more African-American staff members. (Doc. Nos. 39 ¶¶ 36-41, 51 ¶¶ 36-41.)

WHouser, who is African-American, was hired as a direct care worker at Defendant's South Mountain location in April 2012. (Doc. Nos. 42 ¶¶ 17-18, 52 ¶¶ 17-18.) In seven months, WHouser was promoted and offered a $9,500 raise. (Doc. Nos. 42 ¶¶ 19, 21, 52 ¶¶ 19, 21.) WHouser was tasked with training employees on diversity issues. (Doc. Nos. 42 ¶ 31, 52 ¶ 31.) In addition, WHouser brought more African-American staff members to South Mountain pursuant to a directive from Defendant's administrators. (Doc. Nos. 42 ¶ 34, 52 ¶ 34.) WHouser testified that white staff members were jealous of WHouser's successes at South Mountain. (Doc. Nos. 42 ¶ 36, 52 ¶ 36.)

From 2012 to 2013, Plaintiffs claim that numerous racial incidents occurred at Defendant's South Mountain and Breezewood locations. For example, staff members were accused of calling children racist names (Doc. Nos. 47-1 at 49, 47-3 at 24-25); white staff members refused to work with African-American staff members (Doc. No. 47-3 at 23); and four employees made a series of racist YouTube videos on Defendant's property that were viewed by other employees (Doc. No. 47-5 at 19-20). Plaintiffs felt that white staff members were not

being appropriately disciplined for racist behavior, and DHouser reported and recommended punishment for racist incidents. (Doc. No. 47-1 at 49-50, 53, 56.)

In April 2013, two of Defendant's administrators, Jim Yester and Gerry Fox, received an email ("April 2013 email") from a VisionQuest employee containing links to newspaper articles that discussed DHouser's and WHouser's criminal histories. (Doc. Nos. 39 ¶ 48, 42 ¶¶ 41-42, 51 ¶ 48, 52 ¶¶ 41-42.) This email did not mention race. (Doc. Nos. 39 ¶ 51, 42 ¶ 43, 51 ¶ 51, 52 ¶ 43.) Fox questioned DHouser and asked whether DHouser spent time in prison for his crimes. (Doc. Nos. 39 ¶¶ 54-56, 51 ¶¶ 54-56.) DHouser responded "no" to this question, although there is dispute as to what part of DHouser's criminal record he thought he was being questioned about. (Doc. Nos. 39 ¶¶ 55-56, 51 ¶¶ 54-56.) However, DHouser had spent ten years and ten months in prison. (Doc. Nos. 39 ¶ 57, 51 ¶ 57.) Around the same time, WHouser was told that his "rap sheet" was not within his personnel file. (Doc. Nos. 42 ¶ 39, 52 ¶ 39.) WHouser went home to get his criminal background documentation for his file. (Doc. Nos. 42 ¶¶ 44-45, 52 ¶¶ 44-45.)

As part of its investigation into DHouser's and WHouser's criminal history, Defendant reviewed DHouser's and WHouser's employment applications. (Doc. Nos. 39 ¶ 72, 42 ¶ 48, 51 ¶ 72, 52 ¶ 48.) In these applications, DHouser and WHouser were asked whether they had any criminal convictions, to which they responded in the affirmative. (Doc. Nos. 39 ¶ 73, 42 ¶ 49, 51 ¶ 73, 52 ¶ 49.) The application asked them to elaborate on any convictions. (Doc. Nos. 39 ¶ 72, 42 ¶ 50, 51 ¶ 72, 52 ¶ 50.)

DHouser wrote, "1997 drug offense." (Doc. Nos. 39 ¶ 7, 51 ¶ 7.) DHouser signed the employment application, representing that the information he provided was true and complete. (Doc. Nos. 39 ¶ 94, 51 ¶ 94.) DHouser recognized that providing false information on his

application could result in dismissal from employment. (Doc. Nos. 39 ¶ 95, 51 ¶ 95.) DHouser then outlined his criminal history in more detail in a separate letter, which was not signed. (Doc. Nos. 39 ¶¶ 78-80, 51 ¶¶ 78-80.) In this letter, DHouser wrote, in part, that he "was found not guilty of all the charges except the possession of drugs." (Doc. Nos. 39 ¶ 82, 51 ¶ 82.) However, DHouser was actually convicted of charges that included criminal conspiracy, burglary, robbery, and simple assault. (Doc. Nos. 39 ¶¶ 84-86, 51 ¶¶ 84-86.) The parties dispute whether DHouser clarified his convictions later in the letter. (Doc. No. 51 ¶¶ 80, 82.)

Elaborating on his criminal history, WHouser wrote on his application, "Only as a juvenile, never as an adult. Will explain in interview." (Doc. Nos. 42 ¶ 51, 52 ¶ 51.) However, WHouser was convicted of a crime when he was an adult; at age 19, he pled guilty to robbery. (Doc. Nos. 42 ¶ 56, 52 ¶ 56, 59 at 144.) In addition, WHouser pled no contest to criminal attempted homicide when he was 19 years old. (Doc. No. 42 ¶ 58, 52 ¶ 58.)

Defendant terminated DHouser's and WHouser's employment about ten days after Defendant received the email questioning their criminal history (Doc. Nos. 39 ¶¶ 48, 104, 51 ¶ 104, 59-3 at 2). When DHouser and WHouser were terminated, Defendant's administrators told them that their termination was due to their dishonesty about their criminal history. (Doc. Nos. 39 ¶ 105, 42 ¶ 74, 51 ¶ 105, 52 ¶ 74.) However, DHouser and WHouser claim that they were honest about their criminal backgrounds in their interviews and throughout their employment with Defendant. (Doc. Nos. 51 ¶¶ 13, 15, 17, 78-82, 100-101, 52 ¶¶ 62-64.)

DHouser alleges that during his interview with employee Barry Williams, he and Williams reviewed DHouser's background check and convictions, which Williams disputes. (Doc. No. 51 ¶¶ 13, 15.) DHouser also states that he taught classes about his prison experience at South Mountain and that numerous administrators, including South Mountain Chief

Administrator Kris Smihal, knew about and discussed his prison experience with children residing at South Mountain.  (Doc. Nos. 47-1 at 23, 51 ¶ 17.)

WHouser avers that he was unintentionally misleading on his employment application. He claims that when he was sentenced at nineteen years old, he was already in prison for a crime committed while he was a juvenile.  (Doc. No. 47-3 at 46.)  Therefore, when he filled out Defendant's employment application years later, he thought that all of his convictions were from when he was a juvenile.  (Id.)  He says he explained his different convictions and sentences in his interview with Williams.  (Id.)

Defendant had an Employee Handbook as well as policies prohibiting discrimination and retaliation.  (Doc. Nos. 39 ¶ 116, 42 ¶ 87, 51 ¶ 116, 52 ¶ 87.)  Defendant's employees received training on cultural diversity at the time of their hire and through ongoing trainings internally by Williams.  (Doc. Nos. 39 ¶¶ 114-15, 42 ¶¶ 85-86, 51 ¶¶ 114-15, 52 ¶¶ 85-86.)

**B.  Plaintiff Yvette Braxton**

Braxton, who is African-American, was hired as a Case Manager at Defendant's South Mountain location in May 2011.  (Doc. Nos. 45 ¶¶ 12-13, 50 ¶¶ 12-13.)  Before Braxton started her Case Manager position, Defendant contacted her and offered her the advanced position of Director of Treatment at South Mountain, at an annual salary of $35,000.  (Doc. Nos. 45 ¶ 14, 50 ¶ 14.)  Months later, in October 2011, Defendant promoted Braxton to Director of Compliance and Treatment at South Mountain.  (Doc. Nos. 45 ¶ 15, 50 ¶ 15.)  Her promotion included a financial raise of approximately 30%, which resulted in an annual salary of $45,000, and entrusted Braxton with additional responsibilities.  (Doc. Nos. 45 ¶¶ 16-17, 50 ¶¶ 16-17.)

From 2012 to 2013, Braxton claims to have observed and reported numerous racially-charged incidents at South Mountain.  For example, she describes attempting to discipline an

employee for using racist language in the workplace, but being thwarted by Smihal.  (Doc. No. 47-5 at 13-14.)  She felt that on numerous occasions, Smihal failed to discipline white staff members for racist conduct.  (Id. at 13-14, 16-18, 24.)  She also recalled conversations with Smihal that she perceived to be racist.  (Id. at 18.)

In January 2013, DHouser became the Chief Administrator at Defendant's Breezewood location.  (Doc. Nos. 45 ¶ 18, 50 ¶ 18.)  Braxton alleges in her complaint that she then requested a transfer to Breezewood.  (Doc. Nos. 45 ¶ 21, 50 ¶ 21.)  Braxton testified, "I received a phone call from Jerry Fox, And I don't know Jerry's position, but he a corporate person . . . and Jerry talked to me about possibly transferring to Breezewood.  And his words were they need strong African American female staff there, and we think you would make a great addition to the Breezewood Camp."  (Doc. Nos. 45 ¶ 23, 50 ¶ 23.)  Braxton agreed that it was important from a clinical perspective to have an African-American in a predominant role at the Breezewood location.  (Doc. Nos. 45 ¶ 25, 50 ¶ 25.)  Braxton testified that her supervisor at South Mountain, Smihal, asked her not to leave.  (Doc. Nos. 45 ¶ 26, 50 ¶ 26.)

Prior to transferring to Breezewood, Defendant asked Braxton to find and train a replacement to work at the South Mountain location, which she did.  (Doc. Nos. 45 ¶¶ 29-30, 50 ¶¶ 29-30.)  On April 1, 2013, Braxton started her new position at Breezewood as a Clinical Supervisor.  (Doc. Nos. 45 ¶ 31, 50 ¶ 31.)  Braxton claims that when she arrived, racist incidents were occurring at Breezewood, in part because white staff members were unhappy that DHouser brought another black employee to Breezewood.  (Doc. No. 47-5 at 36-38.)  Braxton was allegedly called derogatory names.  (Id. at 36.)  Numerous staff meetings were held to address the racial tension at Breezewood.  (Id. at 37.)

On or about April 24, 2013, DHouser was terminated from his position at Breezewood. (Doc. Nos. 45 ¶ 32, 50 ¶ 32.)  Also in April, Defendant held a finance meeting to discuss financial issues at Breezewood.  (Doc. Nos. 45 ¶ 33, 50 ¶ 33.)  Braxton acknowledges that Defendant's CEO suggested eliminating a position, including possibly Braxton's position, but that Fox suggested eliminating a different position.  (Doc. Nos. 45 ¶ 34, 50 ¶ 34.)  Yester testified that after Defendant terminated DHouser, Fox became the interim Chief Administrator at Breezewood.  (Doc. Nos. 45 ¶ 36, 50 ¶ 36.)

In addition to Breezewood, only two of Defendant's locations, the New Directions Shelter and South Mountain, employed a Clinical Supervisor in addition to a Chief Administrator.  (Doc. Nos. 45 ¶ 38, 50 ¶ 38.)  The New Directions Shelter and South Mountain were two of Defendant's larger locations, with an average census (number of children residents) of 78 and 59, respectively.  (Doc. Nos. 45 ¶ 39, 50 ¶ 39.)  Defendant's smaller locations did not employ a Clinical Supervisor.  (Doc. Nos. 45 ¶ 40, 50 ¶ 40.)  The following locations did not employ a Clinical Supervisor:  (a) VisionQuest Academy at Franklin (average census 49), (b) VisionQuest Academy at Standing Timbers (average census 27), (c) Lee Preparatory Academy at Meadville (average census 29), (d) Lee Preparatory Academy in Philadelphia (average census 18), and (e) Bucks County Group Home (average census 6).  (Doc. Nos. 45 ¶ 41, 50 ¶ 41.)  Breezewood's census was, at best, one-half of the census of the two Defendant locations employing Clinical Supervisors, and at one point was only one-third of the census of those locations.  (Doc. Nos. 45 ¶ 43, 50 ¶ 43.)   Defendant determined that it was in its best interest to eliminate Braxton's position at Breezewood, laying her off on May 21, 2013.  (Doc. Nos. 45 ¶ 45, 50 ¶ 45.)  Defendant informed Braxton that the layoff was due to financial issues at the Breezewood location.  (Doc. Nos. 45 ¶ 46, 50 ¶ 46.)

In the 2013 fiscal year ending in June 2013 (within one month of Braxton's departure), Breezewood's financial loss was $101,831. (Doc. Nos. 45 ¶ 49, 50 ¶ 49.) By way of comparison, the Breezewood location had made a net profit in the 2011 and 2012 fiscal years of $86,086 and $93,844, respectively. (Doc. Nos. 45 ¶ 50, 50 ¶ 50.) Further, the census at Breezewood declined in the months after Braxton's layoff. (Doc. Nos. 45 ¶ 51, 50 ¶ 51.) The census fell from an average of 27 residents in the last quarter of 2012 to 21 residents in the last quarter of 2013 – nearly a 20% decline. (Doc. Nos. 45 ¶ 52, 50 ¶ 52.) After her termination, Defendant did not replace Braxton. (Doc. Nos. 45 ¶ 53, 50 ¶ 53.) Defendant laid off three other people from mid-January 2013 through mid-September 2013, all of whom were white. (Doc. Nos. 45 ¶ 56, 50 ¶ 56.) Defendant's Vice President of Administration, Beth Rosica, testified that Defendant closed 6 facilities in the past few years, including the Breezewood facility, which ultimately closed in September 2015. (Doc. Nos. 45 ¶ 57, 50 ¶ 57.)

However, prior to her termination, Braxton claims she felt targeted as the only African-American member of the management team at Breezewood. (Doc. No. 47-5 at 44.) She asserts that her schedule was changed when the other white managers' schedules were not and that she was called to meetings on her days off that the white managers were not forced to attend. (Id. at 42-44) In addition, she questions the financial motive of her termination, as Fox had recently spoken to her about giving her a raise and Breezewood's census did not change between her arrival and her termination. (Id. at 44.) Furthermore, although Defendant points to other employees who were terminated for financial reasons around the same time as Braxton, Braxton indicates that these employees were terminated three to four months before and after her termination. (Doc. No. 57 at 200-01.) Finally, although the Breezewood facility eventually

closed due to financial difficulties, it did not close under September 2015, over two years after Braxton was allegedly terminated for financial reasons.  (Id. at 190)

During her deposition, Braxton testified that she had no recollection of racist or discriminatory statements made by Defendant supervisors Yester or Fox.  (Doc. Nos. 45 ¶ 59, 50 ¶ 59.)  Defendant had an Employee Handbook as well as policies prohibiting discrimination and retaliation.  (Doc. Nos. 45 ¶ 60, 50 ¶ 60.)  Defendant employees received training on cultural diversity at the time of their hire and through ongoing trainings internally by Williams.  (Doc. Nos. 45 ¶ 61, 50 ¶ 61.)

## II.    LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is material if it might affect the outcome of the suit under the applicable law, and it is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  At summary judgment, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.  Id. at 251-52.  In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion."  A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004).  Once the moving party has shown that there is an absence of

evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Grp. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted. Celotex, 477 U.S. at 322. With respect to the sufficiency of the evidence that the non-moving party must provide, a court should grant a motion for summary judgment when the non-movant's evidence is merely colorable, conclusory, or speculative. Anderson, 477 U.S. at 249-50. There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. Id. at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Further, a party may not defeat a motion for summary judgment with evidence that would not be admissible at trial. Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 387 (3d Cir. 1999).

## III. DISCUSSION

### A. Race Discrimination Claims

#### 1. Legal Standard Applicable to Race Discrimination Claims

In this case, Plaintiffs bring claims of race discrimination and retaliation under 42 U.S.C. § 1981. Section 1981 provides, in relevant part, that "[a]ll persons . . . shall have the same right in every State and Territory to make and enforce contracts." Id. "[T]he term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Id. When employment discrimination claims are brought under § 1981, courts apply the tests used to

evaluate employment discrimination claims brought under Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e et seq.; Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 267 (3d Cir. 2010). There are two tests that are applied to such race discrimination claims, but the parties agree that the McDonnell Douglas analysis governs this case.

Under the McDonnell Douglas test, a plaintiff must first establish a prima facie case of race discrimination, which includes establishing that (1) the plaintiff is a member of a protected class, (2) he was qualified for his position, (3) he suffered an adverse employment action, and (4) the circumstances raise an inference of unlawful discrimination. Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003). If a plaintiff meets this burden, the defendant must "articulate some legitimate, nondiscriminatory reason" for firing the plaintiff. Id. If the defendant does so, the plaintiff must show that the defendant's reason for firing him is pretext. Id.

### 2. Plaintiff Donald Houser's Race Discrimination Claim

The parties agree that DHouser is a member of a protected class and suffered an adverse employment action. However, the parties disagree as to whether DHouser was qualified for his position and whether the circumstances of his termination raise an inference of unlawful discrimination. The parties also dispute whether DHouser sufficiently established pretext.

### a. Qualifications

Defendant argues that DHouser fails to state a prima facie case of race discrimination in that he cannot show that he was qualified for his positions with Defendant. Specifically, Defendant argues that DHouser was unqualified because he was dishonest or misleading on his employment application, which is also the legitimate reason proffered by Defendant for DHouser's termination. (Doc. No. 40 at 20, 23.) Defendant cites to Nelson v. Devry, No. 07-4436, 2009 WL 1213640, at *6 (E.D. Pa. Apr. 23, 2009), for the proposition that "[w]hen an

employee violates a company policy resulting in that employee's discharge, it is clear that such an employee is not meeting the employer's legitimate expectations, and, thus, is not qualified for the position." (Doc. No. 40 at 20.)

However, numerous circuit courts have found that "a court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case." Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 574 (6th Cir. 2003); Melendez v. Autogermana, Inc., 622 F.3d 46, 51 (1st Cir. 2010); EEOC v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1193 (10th Cir. 2000). Doing so would "bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination." Wexler, 317 F.3d at 574; Melendez, 622 F.3d at 51; Horizon, 220 F.3d at 1193. This reasoning has been adopted by various district courts in the Third Circuit, see Ace v. Armstrong Utils. Inc., No. 14-526, 2016 WL 738051, at *25 (W.D. Pa. Feb. 25, 2016) ("To require Plaintiff to rebut this reason in order to establish a prima facie case of discrimination improperly imports into the prima facie analysis the later stages of the McDonnell Douglas test."); Miller v. Keystone Blind Ass'n/TPM, No. 11-887, 2013 WL 93651, at *5 (W.D. Pa. Jan. 8, 2013); Nunez v. Temple Prof'l Assocs., No. 03-cv-6226, 2005 WL 435238, at *4 (E.D. Pa. Feb. 22, 2005), and Nelson does not mention this line of decisions.[2] Therefore, Nelson's reasoning is unpersuasive.

---

[2] In addition, Nelson's reasoning has been further whittled away by numerous cases that indicate that "whether a plaintiff subjectively fulfilled an employer's expectations is more appropriately considered during the pretext stage of the analysis." Sweeney v. Roche Diagnostics Corp., No. 4:11-cv-01691, 2013 WL 6731049, at *7 (M.D. Pa. Dec. 19, 2013); Weldon v. Kraft, Inc., 896 F.2d 793, 798 (3d Cir. 1990); Fowle v. C & C Cola, 868 F.2d 59, 64-65 (3d Cir. 1989). Accordingly, Nelson's discussion of "the employer's legitimate expectations" in the context of the prima facie case of discrimination is unpersuasive.

Pursuant to the above-cited precedent, consideration of DHouser's dishonesty on his employment application during Plaintiff's <u>prima facie</u> case would deny him the opportunity to show that Defendant's proffered nondiscriminatory reason is pretext. Therefore, this Court declines to find DHouser unqualified due to his dishonesty on his employment application. Evidence of DHouser's dishonesty is properly analyzed during the second and third parts of the <u>McDonnell Douglas</u> test.

Aside from his dishonesty on his employment application, Defendant does not offer any reason why DHouser was unqualified for his position. (Doc. No. 40 at 20-21.) In addition, Defendant admits to promoting DHouser multiple times during his first two years of employment. (Doc. No. 39 ¶¶ 18-30); <u>see</u> <u>Miller</u>, 2013 WL 93651, at *5 ("First, Defendant promoted Plaintiff to the position of Lead Attendant, thus it cannot easily contend that he was 'unqualified' for the position."). These promotions were accompanied by significant salary increases. (Doc. No. 39 ¶¶ 18-30.) DHouser also received positive performance evaluations and various awards during his tenure with Defendant. (<u>Id.</u> ¶¶ 17-18, 20, 28, 34.) Consequently, this Court finds that DHouser has met his initial burden of establishing that he was qualified for his positions with Defendant.

### b. Inference of Discrimination & Pretext

In order to raise an inference of discrimination, the fourth element of a <u>prima</u> facie case, a plaintiff in a race discrimination action must show acts that, "if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." <u>Furnco Constr. Corp. v. Waters</u>, 438 U.S. 567, 577 (1978); <u>see</u> <u>Pivirotto v. Innovative Sys., Inc.</u>, 191 F.3d 344, 356 (3d Cir. 1999) (explaining that "Supreme Court precedent . . . clearly require[s] only 'evidence adequate to create an inference that an employment decision was based on an illegal

discriminatory criterion'"). A plaintiff may raise this inference by showing that similarly-situated individuals outside the protected class were treated more favorably than the plaintiff, Matczak v. Frankford Candy and Chocolate Co., 136 F.3d 933, 939 (3d Cir. 1997); Hileman v. Penelec/FirstEnergy Corp., No. 1:14-cv-1771, 2017 WL 2778562, at *5 (M.D. Pa. June 27, 2017), but the test is a flexible one, and different factual circumstances may call for different analyses. Pivirotto, 191 F.3d at 357.

        In this case, there exist disputed material facts, construed in the light most favorable to DHouser, from which a reasonable factfinder could infer that unlawful discrimination motivated Defendant's decision to terminate DHouser's employment. The record shows that Defendant may have known about DHouser's criminal history for almost two years before it fired him for lying about that history. (Doc. Nos. 47-1 at 22-28, 47-13 at 16.) DHouser claims that Yester, who made the decision to terminate his employment, and other administrators and management-level employees knew about his criminal history and supported his employment by Defendant prior to the receipt of the April 2013 email. (Doc. Nos. 47-1 at 26-29, 47-13 at 16.) Moreover, Defendant did not terminate white employees for racist behavior engaged in on Defendant's property, but terminated DHouser for lying on his application almost two years after he submitted the application, after many upper-level employees allegedly knew about his criminal background, and after he received numerous promotions, raises, and awards. (Doc. No. 47-1 at 76-77.) These disputed facts permit a sufficient inference of race discrimination to establish a prima facie case, requiring Defendant to articulate a "legitimate, nondiscriminatory reason" justifying its decision to terminate DHouser's employment.

Defendant's proffered legitimate reason for terminating DHouser's employment is DHouser's dishonesty on his employment application.[3] "[T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). "[T]he non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" Id. at 765.

DHouser has identified sufficient disputed material facts, construed in the light most favorable to DHouser, that could support a reasonable factfinder's conclusion that Defendant's reason for terminating him was pretextual. As discussed above, Defendant claims to have terminated DHouser for lying about his criminal history on his employment application (Doc. Nos. 39 ¶ 105, 51 ¶ 105), although DHouser maintains that he told Defendant's employees in his interview and throughout his employment about his criminal history and prison time (Doc. No. 51 ¶¶ 13, 15, 17, 78-82). In light of the racial issues occurring at South Mountain and

---

[3] Although DHouser disputes the fact that he was dishonest on his application (Doc. Nos. 39 ¶ 76, 51 ¶ 76), he agrees that he wrote "1997 drug offense" in the criminal background section of the application, in spite of his other convictions. (Doc. Nos. 39 ¶¶ 74-75, 51 ¶¶ 74-75.) He also agrees that in an explanatory letter outlining his criminal history, he wrote that he was charged with disorderly conduct, criminal conspiracy, and possession of drugs, but was "found not guilty of all the charges except the possession of drugs." (Doc. Nos. 39 ¶¶ 80-82, 51 ¶¶ 80-82.) However, DHouser was convicted of numerous crimes aside from drug possession. (Doc. Nos. 39 ¶¶ 83-84, 51 ¶¶ 83-84.) DHouser recognized that by signing the application, he represented that the information was true and complete to the best of his knowledge, and that to the extent his application contained false or misleading information, it could result in disqualification or discharge from employment. (Doc. Nos. 39 ¶¶ 94-95, 51 ¶¶ 94-95.) Defendant has therefore articulated a legitimate, non-discriminatory reason for DHouser's termination.

Breezewood during DHouser's employment and his attempts to call attention to and remedy these issues, a reasonable factfinder could find Defendant's proffered nondiscriminatory reason for DHouser's termination to be pretextual. Therefore, this Court will deny Defendant's motion for summary judgment with respect to DHouser's race discrimination claim.

### 3. Plaintiff William Houser's Race Discrimination Claim

The parties agree that WHouser is a member of a protected class and suffered an adverse employment action. However, the parties disagree as to whether WHouser was qualified for his position and whether the circumstances of his termination raise an inference of unlawful discrimination and pretext.

#### a. Qualifications

Defendant argues that WHouser is unqualified because the evidence shows that he was dishonest or misleading on his employment application. (Doc. No. 43 at 20.) However, based on the discussion <u>supra</u> regarding DHouser's qualifications and considering WHouser's numerous promotions, raises, and awards during his employment with Defendant (Doc. Nos. 42 ¶¶ 19, 21, 25, 52 ¶¶ 19, 21, 25), this Court finds WHouser qualified for his positions with Defendant.

#### b. Inference of Discrimination & Pretext

In this case, there exist disputed material facts, construed in the light most favorable to WHouser, from which a reasonable factfinder could infer that unlawful discrimination motivated Defendant's decision to terminate his employment. The record shows that Defendant may have known about WHouser's criminal history for ten months before it terminated him for lying about that history (Doc. No. 47-3 at 39-41), as WHouser claims that he reviewed his background check with Williams during his interview and that he saw Williams hand his background check to a

secretary to fax to Defendant's corporate office (Doc. No. 52 ¶ 55). In addition, WHouser complained about racist staff behavior, some of which was directed at him, and explained that white staff were jealous of the success he and other African-American staff members were having with the children under their care. (Doc. No. 47-3 at 23-25.) WHouser even recounts an incident in which his supervisor, Smihal, made racially insensitive comments in front of him. (Doc. No. 47-3 at 31.) He was then fired after receiving various promotions, raises, and positive evaluations. (Doc. Nos. 42 ¶¶ 19, 21, 25, 52 ¶¶ 19, 21, 25.) These disputed facts permit a sufficient inference of race discrimination to establish a prima facie case and require Defendant to articulate a legitimate, nondiscriminatory reason justifying its decision to terminate WHouser's employment.

Although Defendant proffered a legitimate reason for terminating WHouser's employment, namely, WHouser's dishonesty on his employment application, the above-described disputed facts provide a sufficient basis for a reasonable factfinder to infer that Defendant's proffered nondiscriminatory reason for terminating WHouser's employment was pretextual and "did not actually motivate the employment action." Fuentes, 32 F.3d at 764. Therefore, this Court will deny Defendant's motion for summary judgment with respect to WHouser's race discrimination claim.

### 4. Plaintiff Yvette Braxton's Race Discrimination Claim

The parties agree that Braxton is a member of a protected class, was qualified for her position, and suffered an adverse employment action. However, the parties disagree as to whether the circumstances of her termination raise an inference of unlawful discrimination.

In this case, there exist disputed material facts, construed in the light most favorable to Braxton, from which a reasonable factfinder could infer that unlawful discrimination motivated

Defendant's decision to terminate Braxton's employment, and therefore, Braxton has established a prima facie case of race discrimination. As the only African-American member of the Breezewood location's management team, Braxton claims that her schedule was changed when white managers' schedules were not changed. (Doc. No. 47-5 at 43.) She also testified that she was also forced to work nights and weekends, and was called to meetings on her days off to which white managers were not called. (Id. at 43-44.) Braxton also avers that she attempted to discipline a white employee for racist behavior, but her attempts were thwarted. (Doc. No. 47-5 at 13-14.)

In response, Defendant claims that Braxton's employment was terminated for a legitimate, nondiscriminatory reason, specifically, for financial reasons. (Doc. Nos. 45 ¶ 46, 50 ¶ 46.) However, a few months prior to Braxton's termination, Fox allegedly spoke to her about giving her a $2,000-$3,000 raise. (Doc. No. 47-5 at 44.) In addition, the financial records submitted by Defendant show that when Braxton was terminated, Breezewood had the same number of children residents as it did when she initially requested transfer to Breezewood. (Doc. No. 47-15 at 39-45.) Although the number of residents declined after Braxton was terminated, the numbers were higher while Braxton was employed at Breezewood compared to subsequent months. (Doc. No. 47-15 at 43-51.) In addition, although Defendant claims that other employees were terminated for financial reasons in close proximity to Braxton's termination, those employees were terminated three to four months before and after Braxton's termination. (Doc. No. 47-14 at 18.) Further, Braxton identifies racial incidents that occurred while she was employed at South Mountain and Breezewood, including incidents in which she requested punishment for white staff members who used racial slurs in the workplace. (Doc. No. 47-5 at 14-16.) Braxton has pointed to sufficient disputed material facts from which a reasonable

factfinder could infer that Defendant's articulated legitimate, nondiscriminatory reason for terminating her employment was a pretext for discrimination. Therefore, the Court will deny Defendant's motion for summary judgment with respect to Braxton's race discrimination claim.

### B. Retaliation Claims

### 1. Legal Standard Applicable to Retaliation Claims

The <u>McDonnell Douglas</u> burden-shifting test also applies to retaliation claims under § 1981. To establish a <u>prima facie</u> case of retaliation, Plaintiffs must establish that (1) they engaged in protected activity, (2) Defendant took an adverse action against them, and (3) there was a causal connection between their participation in the protected activity and the adverse action. <u>Estate of Oliva ex rel. McHugh v. New Jersey</u>, 604 F.3d 788, 798 (3d Cir. 2010). In addition, "[i]n a retaliation case a plaintiff must demonstrate that there had been an underlying section 1981 violation." <u>Id.</u> If Plaintiffs meet this burden, Defendant must articulate a legitimate reason for terminating Plaintiffs' employment. <u>Id.</u> If Defendant succeeds, Plaintiffs must show that Defendant's reasons for firing them were pretext. <u>Id.</u>

"To engage in 'protected activity' a plaintiff cannot complain about merely unfair treatment, rather they must complain about discrimination based on membership in a protected class." <u>McClain v. Avis Rent A Car Sys., Inc.</u>, 648 F. App'x 218, 224 (3d Cir. 2016). Complaints may be in the form of formal disciplinary charges or grievances against an employer, and may also include "informal protests of discriminatory employment practices, including making complaints to management." <u>Daniels v. Sch. Dist. of Phila.</u>, 776 F.3d 181, 193 (3d Cir. 2015) (internal quotations omitted); <u>Merke v. Lockheed Martin</u>, 645 F. App'x 120, 124 (3d Cir. 2016).

### 2. Plaintiffs' Retaliation Claims

DHouser identifies the following circumstances that he alleges constitute engagement in protected activity (Doc. No. 54 at 24): (1) reporting and attempting to remedy racial tension (Doc. No. 47-1 at 49-50, 53); (2) refusing to lie for Smihal when interviewed during an investigation into her behavior (id. at 43, 51); (3) addressing staff members' racially inappropriate behavior (id. at 49-50, 53, 56); (4) seeking appropriate sanctions for staff who engaged in racist behavior (id. at 50, 53, 56); (5) exposing Smihal's inappropriate actions to Defendant's administrators (id. at 43); (6) opposing Smihal when she refused to sanction racist behavior (id. at 50); and (7) attempting to integrate the staff at Breezewood (id. at 54-55).

WHouser claims that he engaged in the following protected activity (Doc. No. 55 at 22): (1) reporting racist conduct by white staff members (Doc. No. 47-3 at 24-25, 28); (2) reporting the fact that African-American and white staff members were divided by shift (id. at 22-23); and (3) asking to be transferred from South Mountain to Breezewood to get away from racial issues (id. at 34).

Finally, Braxton identifies the following instances of alleged protected activity (Doc. No. 53 at 24-25): while at South Mountain, (1) attempting to discipline a white employee for using racist language but being thwarted by Smihal (Doc. No. 47-5 at 13-14); (2) complaining to Smihal about the racist YouTube videos and advocating for the termination of the involved employees (id. at 23-24, 26); and while at Breezewood, (3) working through racial issues with Fox and DHouser (id. at 37-38); and (4) being subjected to schedule changes when her white co-workers were not (id. at 43-44).

Protected activity in the context of a § 1981 retaliation claim involves complaining to an employer about racially discriminatory activities engaged in by that employer. See Crawford v.

Metro Gov't of Nashville & Davidson Cnty., 555 U.S. 271, 276 (2009) ("'When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication' virtually always 'constitutes the employee's opposition to the activity.'") (citation omitted).

Construing all facts in the light most favorable to Plaintiffs, this Court concludes that Plaintiffs have sufficiently identified potentially protected activities in which they engaged for purposes of establishing a prima facie case of retaliation. For example, both DHouser and Braxton tried to address staff members' racist behaviors through discipline, which included opposing Smihal, their superior, when she refused to sanction racist behavior. (Doc. Nos. 47-1 at 49-50, 53, 56, 47-5 at 13-14, 23-24, 26.) In addition, WHouser reported the division of African-American staff members and white staff members by shift. (Doc No. 47-3 at 22-23.)

Furthermore, although Plaintiffs have not provided much detail about the timing of these potentially protected activities relative to their respective terminations, based on the Court's review of the record, all of the incidents appear to have occurred within a relatively short time frame, after which Plaintiffs were terminated. Therefore, the Court finds that, construing all facts in the light most favorable to Plaintiffs, a reasonable factfinder could find that Plaintiffs' terminations were causally related to Plaintiffs' engagement in these activities, and therefore, Plaintiffs have state a prima facie case of retaliation. Further, in light of the Court's conclusion supra regarding the existence of disputed material facts, construed in the light most favorable to Plaintiffs, from which a reasonable fact-finder could infer that Defendant's stated nondiscriminatory reasons for terminating Plaintiffs' employment were pretextual, the Court will deny Defendant's motions for summary judgment with respect to Plaintiffs' retaliation claims.

## IV.   CONCLUSION

For all of the reasons discussed above, the Court will deny Defendant's motions for summary judgment.  An appropriate Order follows.